## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Alison Weidner,

          Plaintiff,

             **MEMORANDUM OPINION**
   v.              **AND ORDER**
              Civil No. 04-4477 ADM/JSM

Federal Express Corporation,

          Defendant.

_____

Mark N. Nolan, Esq., Nolan, MacGregor, Thompson & Leighton, St. Paul, MN, appeared for and on behalf of Plaintiff.

Colby S. Morgan, Jr., Esq., Federal Express Legal Department, Memphis, TN, appeared for and on behalf of Defendant.

_____

## I. INTRODUCTION

On February 22, 2006, oral argument before the undersigned United States District Judge was heard on the cross Motions for Summary Judgment of Defendant Federal Express Corporation ("Federal Express" or "Defendant") [Docket No. 19] and Plaintiff Alison Weidner ("Weidner" or "Plaintiff") [Docket No. 25]. Plaintiff's Complaint alleges Employee Retirement Income Security Act ("ERISA") violations based on Defendant's denial of long-term disability benefits to Plaintiff. The Defendant did not abuse its discretion in denying benefits to Plaintiff. Therefore, Defendant's Motion is granted and Plaintiff's Motion is denied.

## II.  BACKGROUND[1]

### A.    The Plan

Federal Express maintains an ERISA employee welfare benefit plan, the Federal Express

_____

[1] For purposes of the instant Motion, the facts are viewed in the light most favorable to Plaintiff, the nonmovant. See Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

Corporation Long Term Disability Plan (the "Plan").  The Plan funds and provides payment of

long-term disability benefits for Federal Express employees.  Plan (Marsh Decl. [Docket No. 22]

Ex. 5) at 203.  The Plan identifies Federal Express as the administrator of the Plan.  Id. at 204.

Federal Express' Employee Benefits Department is in charge of administering the Plan.  Id.

Federal Express has contracted Broadspire Services, Inc. ("Broadspire") to be the Claims Paying

Administrator of the Plan.  Id. at 205.  The Plan grants discretionary authority to the Federal

Express Benefit Review Committee:

> The committee . . . shall be empowered to interpret the Plan's provisions in accordance
> with its terms with respect to all matters properly brought before it . . . including, but not
> limited to, matters relating to the eligibility of a claimant for benefits under the Plan.  The
> determination of the committee shall be made in a fair and consistent manner in
> accordance with the Plan's terms and its decision shall be final, subject only to a
> determination by a court of competent jurisdiction that the committee's decision was
> arbitrary and capricious.

Id. at 254.

Federal Express employees covered by the Plan are eligible for long-term disability

benefits if the employee becomes disabled under the Plan's definition.  Id. at 221.  In that

instance, the Plan provides that 60% of the employee's monthly income.  Id.  The Plan defines

"disabled" as:

> Disability or Disabled shall mean either an Occupational Disability or a Total Disability;
> provided, however, that a Covered Employee shall not be deemed to be Disabled or
> under a Disability unless he is, during the entire period of Disability, under the direct care
> and treatment of a Practitioner and such Disability is substantiated by significant
> objective findings which are defined as signs which are noted on a test or medical exam
> and which are considered significant anatomical, physiological or psychological
> abnormalities which can be observed apart from the individual's symptoms.

Id. at 207.  Significant objective findings are further defined by the Plan:

> Significant objective findings of a disability are necessary to substantiate the period of
> time your health care professional indicates you are disabled.  Significant objective

2

findings are those that can be observed by your health care professional through objective means, not just from your description of the symptoms.  Objective findings include:

–Medical examination findings
–Test results
–X-ray results
–Observation of anatomical, physiological or psychological abnormalities.

Summary Plan Description (Marsh Decl. Ex. 4) at 196.  An employee suffering from an occupational disability, meaning a physical or mental impairment that prevents an employee from performing the functions of his regular occupation, may receive long-term benefits for a period of two years.  Plan at 211-12, 221, 224.  To receive benefits beyond two years, an employee must be totally disabled.  Id. at 224.  Total disability is defined as follows:

> Total Disability shall mean the complete inability of a Covered Employee, because of a medically-determinable physical impairment (other than an impairment caused by a mental or nervous condition or a Chemical Dependency), to engage in any compensable employment for twenty-five hours per week for which he is reasonably qualified (or could reasonably become qualified) on the basis of his ability, education, training or experience.

Id. at 216.  Additionally, total disability based on a "mental impairment" or "nervous condition" is limited to two years.  Id. at 224.

In her Motion, Weidner cites a number of documents she claims to be Federal Express guidelines on claims handling.  Galman Aff. [Docket No. 27] ¶ 2.  The exhibits, however, are not part of the administrative record, to which the Court is limited.  Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997).  Moreover, despite Weidner's allegations, there is no evidence that these documents are part of Federal Express' plan guidelines.  Rather, the documents are identified on their face as those of Broadspire, the Claims Paying Administrator.  Exhibits to Galman Aff.  There is no evidence that Federal Express, who is the Plan Administrator, adopted these guidelines.  Curfman Aff. [Docket No. 34] ¶ 3.  Because these

3

documents are not part of the administrative record and were not part of the Plan guidelines, they will not be considered here.

**B.      Plaintiff's Disability Benefits Claims**

Alison Weidner was hired by Federal Express in February 1983 as a Manager/Ramp Operations.  Marsh Decl. Ex. 3 at 9, 18.  After completing 180 days of employment with Federal Express, Weidner became a "Covered Employee" under the Plan, and was therefore eligible for disability benefits.  Plan at 206, 208, 217-18, 221.  From the time period between October 2, 2000, and April 1, 2001, Weidner received short-term disability benefits under the Federal Express Corporation Short Term Disability Plan due to symptoms caused by multiple sclerosis ("MS").  Marsh Decl. Ex. 3 at 18-19.  On April 1, 2001, Plaintiff began receiving long-term disability benefits under the Plan.  Id.

On October 1, 2002, Weidner was notified by the Federal Express Disability Claim Unit of Kemper National Services, Inc. ("Kemper") that it would be conducting an investigation of her claim for benefits.  Id. at 93-94.  The letter explained that Weidner's long-term disability benefits based on her inability to perform the duties of her regular occupation would expire on April 1, 2003, and that to continue on long-term disability, Weidner would have to demonstrate she suffered from a total disability and could not engage in any compensable employment for twenty-five hours per week.  Id.  Kemper asked Weidner to provide "significant objective findings by which impairment can be determined."  Id.

Kemper notified Plaintiff on February 28, 2003, that her condition did not meet the definition of total disability, and therefore, her long-term disability benefits would cease on April 1, 2003.  Id. at 21-23.  Plaintiff submitted an administrative appeal of this decision.  The Federal

Express Claim Unit/Appeal Department received a copy of Weidner's administrative appeal on

June 19, 2003.  On the same date, Neurological Associates of St. Paul faxed the Federal Express

Claim Unit/Appeal Department a copy of Weidner's functional capacity assessment dated March

9, 2001.  Id. at 95-103.  On June 6, 2004, the Federal Express Benefits Review Committee

upheld the denial of Weidner's claims for long-term disability benefits based on her total

disability claim, citing a "lack of objective data to support a functional impairment that would

preclude her from working twenty-five hours per week at any occupation."  Marsh Decl. Ex. 1 at

1-5.  The Federal Express Benefits Review Committee sent Weidner a letter confirming this

decision on August 13, 2004.  Marsh Decl. Ex. 2 at 6-8.

**C.      Plaintiff's Medical History**

Weidner began seeing her treating physician, Dr. Charles F. Ormiston ("Ormiston") of

Neurological Associates of St. Paul on December 19, 2000.  Marsh Decl. Ex. 3 at 71-72.  At that

consultation, Weidner told Dr. Ormiston that she thought she had been suffering from multiple

sclerosis ("MS") for twelve to fifteen years.  Id.  He recorded that a recent exacerbation in the

MS had caused symptoms consisting of "dizziness bad enough that she does not feel comfortable

driving, numb feeling in her legs . . . weak tired feeling, trembling in her hands and legs and

slightly slurred speech."  Id.  A MRI demonstrated "moderately extensive demyelinating

disease."  Id.  Dr. Ormiston's physical examination revealed "no difficulty with speech . . . her

memory seemed to be intact.  Her cranial nerve exam showed nystagmus, bilateral temporal

pallor on disc exam.  No evidence of abnormality of other cranial nerves.  There was no drift to

the arms.  Strength was intact.  Reflexes were symmetrically brisk. . . . Sensory exam showed

decreased perception to vibration and touch distally.  There is a tremor, right worse than left,

5

present with posture, present with movement." Id.

Weidner saw Dr. Ormiston again on January 2, 2001.  He noted "mild finger-nose-finger dysmetria, mild ataxia, no focal weakness but a diffuse weakness is present.  Reflexes are symmetric." Id. at 92.  Dr. Ormiston's Kemper Physician Report filed the same day lists under objective physical findings, "dizziness, numbness in lower extremities, fatigue, trembling in hands and legs and slightly slurred speech." Id. at 76.  A few weeks later, on January 31, 2001, Dr. Ormiston reported Weidner "feels as if she is getting better . . . . [Weidner's husband] can see that she seems sharper both cognitively and physically." Id. at 73.

In a letter Dr. Ormiston wrote on February 8, 2001, he stated the "[o]bjective abnormal findings" he had observed in Plaintiff, including: "nystagmus, optic pallor, tremor, decreased sensation." Id. at 74.  Objective tests included an MRI of Weidner's head "showing moderately extensive multiple sclerosis." Id.  Dr. Ormiston instructed Weidner not to work to prevent "major life-altering permanent totally disabling disease" and to enable her to be on a chemotherapy drug used to treat MS. Id.

On March 9, 2001, a functional capacity assessment was performed to measure Weidner's abilities.  The results indicated Weidner could lift or carry twenty pounds occasionally and ten pounds frequently. Id. at 96-103.  Additionally, Weidner was able to stand, walk, or sit for six hours in an eight hour work day. Id.  Weidner had the capacity to push or pull in a limited manner, and no postural, manipulative, communicative, or environmental limitations were found. Id.

Dr. Ormiston filed a further Kemper Physician Report on April 17, 2001, listing objective physical findings of "woozy feeling, vision problems more with left eye, numbness in lower

extremities, fatigue, trembling in hands and legs." <u>Id.</u> at 90.  He extended Weidner's work restrictions until April 30, 2001.  Dr. Ormiston saw Weidner the following week and reviewed her functional capacity evaluation.  <u>Id.</u> at 88.  He concluded that Weidner could not perform even light or sedentary work.  <u>Id.</u>  On April 23, 2001, he again authored a Kemper Physician report, listing objective physical findings of "visual problems, numbness in lower extremities, fatigue, trembling in hands and legs." <u>Id.</u> at 89.

On May 23, 2001, Dr. Ormiston opined that Weidner "can't stand for more than [sic] minutes, needs to stop and rest if she walks more than 20 feet.  She has difficulty even sitting for more than 15 minutes. . . . I believe at this point that she is disabled and have recommended that she apply for Social Security Disability. . . working now is just going to increase the potential of further exacerbations.  From a medical standpoint I do not want her to work." <u>Id.</u> at 86-87.

Continuing through 2001, Dr. Ormiston noted multiple times that Weidner's symptoms were stabilizing.  On June 27, he observed that the "MRI in June showed that there are no new lesions. . . . [Weidner] feels good.  There has been no progression of illness." <u>Id.</u> at 85.  On October 4, he noted that there "is no clear indication that there has been any worsening of her multiple sclerosis." <u>Id.</u> at 84.  On January 22, 2002, he stated that, after having been prescribed Betaseron for three months, Weidner's symptoms had stabilized and she had "not had any significant attacks." <u>Id.</u> at 83.

In late January 2002, Dr. Theodore Passe performed a comparison of two MRIs, one dated January 2002, the other dated June 11, 2001.  <u>Id.</u> at 82.  He noted that the progression of MS was similar in both exams, concluding that "overall the plaque burden is relatively similar to the previous exam." <u>Id.</u>

7

Weidner consulted Dr. Ormiston on October 30, 2002. Dr. Ormiston reported that Weidner had remained "relatively stable over the last several months." Id. at 81. He also reported "[c]ognitively she continues to have subtle problems but manages much better not working. The stress of work really tipped her over the edge. She still has to deal with a six-year-old child and burden of being a homemaker but feels so much better off. . . . [she] has benefitted by working . . . with her emotional issues." Id. at 81. He concluded that Weidner remained "completely disabled and appropriately so," although she "has managed well for two years since we started [Betaseron]." Id.

On January 3, 2003, Dr. Ormiston noticed some decrease in Weidner's condition, noting that subjectively, Weidner complained of more fatigue. Id. at 80. At that time, he suggested that Weidner "consider another short burst of steroids, given the perception of worsening . . ." Id. A few days later, Dr. David Kispert ("Kispert") performed an MRI on Weidner's brain and spine. Comparing the results to the MRI performed in January 2002, Dr. Kispert noted that "[n]o definite new lesions [are] seen." Id. at 44-45. He also concluded that no evidence of demyelinating disease was visible in Weidner's spine. Id.

Dr. Ormiston filed a Kemper Physician Report on February 3, 2003, listing objective physical findings of "L. hemiparesis, ataxia, bladder dysfunction." Id. at 79. Without articulating the underlying reasons, Dr. Ormiston concludes that Weidner was unable to work full duty and unable to work with restrictions. Id. Federal Express' log of the same date stated: ". . . Health/Functionality Update: EE explained that Dr. Ormiston is the only treating doctor keeping her out of work, MS is not inflamed at this time, she has plenty of lesions. Fatigued after minimum exertion . . . ." Id. at 154.

8

In late February 2003, Dr. Vaughn Cohan ("Cohan") performed a general peer review.  In reviewing Weidner's January 3, 2003 exam, Dr. Cohan stated the exam "revealed her cognition to be grossly intact. . . . Her cranial nerves were within normal limits for mild diplopia, worse on right gaze.  Strength in the arms and legs was only very mildly decreased." <u>Id.</u> at 104-05. Ultimately, Dr. Cohan concluded that although Dr. Ormiston had "submitted physician review forms . . . in which he states the claimant cannot work full duty or with restrictions and is fully disabled. . . . the clinical medical reports available for review, and specifically the most recent one dated 1/3/03, do not support that opinion. . . . the objective medical documentation fails to demonstrate evidence of a functional impairment which would preclude the claimant from performing a sedentary job a minimum of 25 hours per week." <u>Id.</u>

Dr. Gerald Goldberg ("Goldberg") also performed a general peer review in July 2003. Although he noted that Weidner had "mild left hemiparesis and mild diplopia and this is primarily on right lateral gaze" and "minimal bladder disturbances," he concluded that this would not produce a functional impairment that would prevent her from working at any occupation for twenty-five hours per week." <u>Id.</u> at 106-07.  Dr. Goldberg performed a second general peer review in August 2003 based on additional information provided by Weidner's MRIs from 2002 and 2003.  This new information did not change Dr. Goldberg's view, who opined that the "new information . . . does not show any changes from a previous scan of January of 2002.  No new information about the claimant's clinical state is presented and there continues to be a lack of objective data to support a functional impairment that would preclude the claimant from working twenty-five hours per week at any occupation." <u>Id.</u> at 108-09.

On December 31, 2003, Dr. Ormiston examined Weidner, and noted that she "has had a

few falls and is worried about that, but she looks very good," deciding he would "give her new prescriptions and make no other changes."  Id. at 12.  In January 2004, Dr. Blake Carlson ("Carlson") performed an MRI on Weidner and compared it to the January 2003 MRIs.  Dr. Carlson noted that there was one new lesion on Weidner's brain, but otherwise, "no other definite enhancing plaques or new plaques are seen."  Id. at 13.  He found no changes in Weidner's spinal MRI.  Id. at 14.

On May 11, 2004, Dr. Goldberg performed a third general peer review.  He noted that Weidner's January 2004 MRI showed little change from the previous year, and concluded that "based on the objective evidence presented, even though there is a minimal change in the MRI of the brain, there [are] no reported clinical deficits that would alter the previous opinion that she did not have a functional impairment that would prevent her from engaging in any compensable employment for a minimum of twenty-five hours per week dating back to April 2, 2003."  Id. at 15-17.

### III. DISCUSSION

#### A.    Standard of Review

#### 1.    Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion

for summary judgment, the Court views the evidence in the light most favorable to the

nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party

may not "rest on mere allegations or denials, but must demonstrate on the record the existence of

specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953,

957 (8th Cir. 1995).

> **2.    ERISA Claim**

An ERISA benefit plan that confers discretion upon an administrator or fiduciary to

interpret plan documents and make decisions denying benefits under the terms of the plan is

reviewed by applying the abuse of discretion standard.  Fletcher-Merrit v. NorAm Energy Corp.,

250 F.3d 1174, 1179 (8th Cir. 2001).  Here, there is no dispute the Plan confers discretion upon

the Plan administrator.  Plan at 254.  However, Weidner argues her claim should be subject to a

de novo standard of review.  In Woo v. Deluxe Corp., the Eighth Circuit held that if a plaintiff

can present "material, probative evidence demonstrating that (1) a palpable conflict of interest or

a serious procedural irregularity existed, which (2) caused a serious breach of the plan

administrator's duty," it is appropriate for a court to analyze plaintiff's claim on a "sliding

scale."  144 F.3d 1157, 1160 (8th Cir. 1998).

Weidner claims that because Federal Express was the plan administrator, a third-party

administrator (Broadspire) who processed claims for Federal Express was Federal Express'

agent, and because the Plan was self-funded, a presumption of financial conflict exists.

However, Weidner has proffered no evidence to support the allegation that Federal Express and

Broadspire are, in fact, one and the same.  Federal Express counters Weidner's argument, stating

that Broadspire is not, in fact, Federal Express' agent, but is an independent company with which

Federal Express has contracted.  Moreover, funds are paid by a trust, not by Federal Express.

Further, the Fifth Circuit recently reviewed this Plan for financial conflicts and found none.

Everett v. Fed. Express Corp., 85 Fed. Appx. 977, 978 (5th Cir. 2004). Because Weidner has

offered no evidence beyond bare allegations to support her contention of a financial conflict, she

has failed to meet her burden of proof on this issue.

Weidner also contends that procedural irregularities exist in Federal Express' review of

Weidner's medical history, arguing that Federal Express failed to properly investigate the claim

by performing only "paper reviews" of Weidner's medical history.  However, Weidner offers no

precedent to suggest that Federal Express' review of Weidner's medical history constituted a

procedural irregularity.

All of the cases cited by Weidner are factually disparate from the instant action.  For

example, in Morgan v. UNUM Life Ins. Co. of Am., the Eighth Circuit did not determine what

standard of review was appropriate, because plaintiff would win under any standard.  346 F.3d

1173, 1177 (8th Cir. 2003).  In Sexton v. Deloitte & Touche LTD Plan, defendant relied on

"paper reviews" of plaintiff's medical records; however, it is distinguishable from the instant

case in that the doctors who reviewed Sexton's file were a psychologist and psychiatrist, neither

of whom had experience with MS, from which plaintiff suffered.  Civ. No. 02-1098, 2003 WL

1701382, *6 (D. Minn. March 27, 2003).  Here, the reviewing physicians were both neurologists.

Because Weidner has not met her burden of proof suggesting a procedural irregularity or a

financial conflict, her claim will be reviewed under the abuse of discretion standard.

The Eighth Circuit has set forth five factors to consider in determining whether a plan

administrator has abused its direction: (1) whether the interpretation is contrary to the clear

language of the plan; (2) whether the interpretation is in line with goals of the plan; (3) whether the interpretation renders any language in the plan inconsistent or meaningless; (4) whether the interpretation conflicts with any requirements of ERISA; and (5) whether the plan has consistently interpreted the provision at issue.  <u>Finley v. Special Agents Mutual Benefit Ass'n, Inc.</u>, 957 F.2d 617, 621-22 (8th Cir. 1982).  Here, however, there is no dispute over the manner in which Federal Express construed or interpreted the Plan.  Rather, the only question is whether the facts support Federal Express' decision.  Courts have characterized the abuse of discretion standard as a question of whether "the plan administrator's decision was reasonable; *i.e.* supported by substantial evidence."  <u>Donaho v. FMC Corp.</u>, 74 F.3d 894, 899 (8th Cir. 1996).  Even if a different reasonable interpretation could have been made, a plan's decision "should not be disturbed" if it "is supported by a reasonable explanation."  <u>Cash</u>, 107 F.3d at 641.  Consequently, the pivotal question for analysis is whether Federal Express' decision was supported by substantial evidence.

Finally, at oral argument and in supplemental briefing, Weidner raised the argument that Federal Express' review of Weidner's claim for long-term disability benefits was flawed because Federal Express examined whether Weidner could "perform" the duties of gainful work, when the proper inquiry, under the Plan's language, was whether Weidner could "engage in employment."  Pl.'s Response to Def.'s Supp. Mem. [Docket No. 49].  Weidner's briefing, however, does not clarify what the difference between "performing" the duties of gainful work and "engaging in employment" are, nor has any precedent been cited parsing the differences between these terms.  In any event, under either term, Weidner fails to demonstrate that Federal Express abused its discretion, as will be discussed below.

**B.**     **ERISA Violation Claim**

Although Weidner has presented strong evidence to support her claim that she met the plan definition of total disability, Federal Express had substantial evidence on which it based its decision.  Therefore, the decision will be upheld.  The Plan states that to meet the definition of total disability, one must be able to demonstrate through significant objective findings that one can not "engage in any compensable employment for twenty-five hours per week for which he is reasonably qualified."  Summary Plan Description at 196; Plan at 216.  Significant objective findings are not based on conditions reported by the claimant; rather, they include medical examination findings, test results, x-ray results, and observation of anatomical, physiological or psychological abnormalities.

The decision made by the Federal Express Benefit Review Committee was based primarily on the findings of Drs. Cohan and Goldberg, each of whom performed peer reviews of Weidner's medical history.  In Dr. Goldberg's case, he reviewed Weidner's history on three separate occasions.  Both Drs. Cohan and Goldberg came to the conclusion that Weidner had sufficient ability to work twenty-five hours a week at a sedentary job.  Marsh Decl. Ex. 3 at 15-17, 104-109.  In their reviews, Drs. Cohan and Goldberg repeatedly cite medical examination findings and MRI comparisons, demonstrating that the doctors did, in fact, review Weidner's medical history and did not simply "rubber stamp" Federal Express' views.  Id.  Additionally, other doctors who reviewed Weidner's MRIs determined that very little progression in the disease occurred between the years 2001 and 2004.  Id. at 44-45, 82.  Finally, the functional capacity assessment performed on Weidner supports the contention that she was physically capable of working twenty-five hours weekly.  Id. at 96-103.

14

Weidner relies on the conclusion of Dr. Ormiston that she was completely disabled and unable to work to demonstrate that Federal Express did not have substantial evidence upon which to deny her benefits.  However, Dr. Ormiston was the only physician to conclude that Weidner was physically incapable of working part time.  Furthermore, Dr. Ormiston's notes suggest his conclusion was influenced by the on-the-job stress incurred by Weidner, nothing that "she manages better not working" and "the stress of work really tipped her over the edge."  Id. at 81.  The Plan, however, states that stress and anxiety are excluded from coverage.  Plan at 211, 216.  It is difficult to discern the extent to which stress played a role in Dr. Ormiston's conclusions.  Consequently, his opinion is of less value because of this factor, despite his frequent contacts with Weidner.  Additionally, Dr. Ormiston's conclusions rarely articulate the factual basis for his opinions.  Although Weidner argues that, as treating physician, Dr. Ormiston's opinion should be accorded more weight than other reviewing physicians, Federal Express is under no obligation to "accord special weight to the opinions of a claimant's physician."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832-34 (2003).

Although Weidner points to objective findings by Dr. Ormiston that illustrate the extent of her MS, Federal Express is not required to disclaim every piece of evidence raised by Weidner.  Rather, it must merely show substantial evidence for its decision.  The opinions of Drs. Cohan and Goldberg, combined with the functional capacity evaluation, support the finding of the Federal Express Benefits Review Committee that Weidner was not totally disabled, and therefore not qualified for further benefits.  As a result, Federal Express' Motion is granted and Weidner's Motion is denied.

**C.     Fiduciary Duty Claim**

Although Weidner did not formally allege an ERISA breach of fiduciary duty claim, the concept is mentioned in her Complaint.  Even if Weidner has pled such a claim, it must be dismissed.  In <u>Wald v. Southwestern Bell Corp. Customcare Medical Plan</u>, the Eighth Circuit held that if a plaintiff is "provided adequate relief by her right to bring a claim for benefits under section 502(a)(1)(B) . . . and she seeks no different relief [under the fiduciary duty claim,] equitable relief would not be appropriate in her case."  83 F.3d 1002, 1006 (8th Cir. 1996). Here, Weidner does not seek relief different than that sought under her 502(a)(1)(B) claim.  As a result, her fiduciary duty claim must be dismissed.

**D.     Prejudgment Interest, Attorney's Fees, and Fines**

In addition to seeking compensatory damages, Weidner requests prejudgment interest, attorney's fees, and requests fines against Federal Express for allegedly failing to timely respond to discovery.  Because Weidner's claims do not survive Federal Express' Motion, her requests for prejudgment interest and attorney's fees fail.  Although Weidner claims she requested claims manuals, guidelines, notes, telephone notes, and e-mails under 29 U.S.C. § 1024(b)(4), it is not clear that the statute requires Federal Express to provide these documents.  Moreover, Weidner again fails to document her claim, instead relying on mere allegations.  This is insufficient to warrant fines against Federal Express.  Weidner's claim is therefore denied.

**IV. CONCLUSION**

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Defendant Federal Express Corporation's Motion for Summary Judgment [Docket

No. 19] is **GRANTED**; and

2.      Plaintiff Alison Weidner's Motion for Summary Judgment [Docket No. 25] is

**DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  May 9, 2006.